[Cite as *State v. McGee*, 2022-Ohio-864.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-21-1077

      Appellee                              Trial Court No. CR0202002481

v.

Tyron McGee                               **DECISION AND JUDGMENT**

      Appellant                             Decided:  March 18, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Anthony J. Richardson, II, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Tryon McGee, appeals the judgment of the Lucas County Court of Common Pleas, following a jury trial, which convicted him of one count of rape. For the reasons that follow, we affirm.

## I. Facts and Procedural Background

{¶ 2} On November 13, 2020, the Lucas County Grand Jury indicted appellant on one count of rape of a victim less than 13 years of age in violation of R.C. 2907.02(A)(1)(b) and (B), an unclassified felony. Appellant entered a plea of not guilty, and a jury trial was held on April 19 and 20, 2021.

{¶ 3} At the trial, the victim, L.T., testified first. L.T. is a ten-year-old girl. L.T. testified about a day that she, her brother, and her sister were at home being watched by appellant, who she referred to as "dad." L.T. testified that she was sitting cross-legged on her mother's bed watching television when her brother and sister came into the room. Appellant told L.T.'s brother and sister to leave. Appellant then asked L.T. to do something with the "wi-fi," and while she was doing that he pulled down her pants. L.T. testified that appellant pulled down his own pants and "put his thing inside me." L.T. explained, "I was kind of confused. And then I asked him what is he doing. He didn't reply. * * * So after that, I said can you stop. He didn't reply. So I asked him again, can you stop? He didn't reply. So I said I have to use the bathroom. He said are you for real. I said yes. He waited a couple minutes, then I went to go use the bathroom."

{¶ 4} After she used the bathroom, L.T. changed her clothes and went downstairs. L.T. was doing the dishes when her mother, L.B., returned home from work. L.B. went upstairs to change and L.T. followed her. L.T. testified that she told her mother what appellant had done to her. L.B. then went and kicked open the bathroom door—where

2.

appellant was taking a shower—and yelled at appellant to get out of her house. Thereafter, L.B. took L.T. to the hospital, where L.T. told the nurse that appellant "put his thing in [her]."

{¶ 5} L.B. testified next. L.B. testified that appellant was her boyfriend at the time and that while he did not live with her, he would spend the night. L.B. also testified that appellant would watch her children while she was at work, and would be responsible for various household chores such as doing the laundry and making sure that the children did their schoolwork. L.B. testified that on September 7, 2020, she returned home from work and changed her clothes. After changing her clothes she went downstairs and sat on the couch while L.T. was finishing the dishes. L.T. then came and told her what had happened. L.B. testified that upon hearing that her daughter was sexually assaulted, she decided to take her to the hospital. L.B. also went upstairs and kicked the bathroom door open and told appellant to leave. L.B. testified that appellant denied the accusations made by L.T., and said to take L.T. to the hospital if she did not believe him.

{¶ 6} The state next called Alicia Mells, who was the sexual assault nurse examiner that examined L.T. Mells testified that L.T. disclosed to her that appellant put his "stuff" in her "coo coo." Mells testified that a physical examination of L.T. revealed two injuries to her vulva. The first was a "possible 2 centimeter tear at twelve o'clock to the hymen." Mells explained that she described it as a possible tear because the hymen looks like a "scrunchie" and it can be hard to tell if there was an injury to it. The second

3.

injury was a "laceration at six o'clock to the posterior fourchette." Mells also discovered redness on L.T.'s perineum, which is the area between her vulva and the anus. Mells testified that she then conducted swabs of L.T.'s outer and inner vagina, but not the vaginal vault, and also the area around L.T.'s anus. The swabs were included in a rape kit that was sent for processing.

{¶ 7} On cross-examination, Mells testified that L.T. denied being in any pain at the time of the examination. In addition, Mells acknowledged that she did not inquire into L.T.'s activities for the previous week to determine if there was any other activity that could have resulted in the injuries. Mells conceded that based on her examination, while she could not rule out what L.T. was reporting, she also could not "rule in" L.T.'s report. However, Mells clarified on re-direct that her findings were consistent with the sexual assault reported by L.T.

{¶ 8} The next person to testify was Logan Schepeler, a forensic DNA scientist for the Ohio Bureau of Criminal Investigation. Schepeler was certified as an expert witness in the field of DNA analysis. Schepeler testified that two tests were conducted on the swabs provided in the rape kit. The first test found a DNA mixture on the vaginal swab. The mixture contained expected DNA from L.T. as well as other DNA, at least a portion of which was from a male, but which was of insufficient quality for a comparison to a standard from any individual. When the first test was conducted on the anal swab, no DNA profile other than L.T.'s was detected. Notably, however, both the vaginal and anal

4.

swabs contained a presumptive positive for acid phosphatase activity, which could indicate the presence of semen.

{¶ 9} The second DNA test was the "Y-STR" test, which is specific to males. Utilizing the Y-STR test, Schepeler testified that he was able to identify the presence of a single Y-STR profile in the vaginal swab, which was consistent with appellant's DNA profile provided in his DNA sample. Schepeler further testified that he would expect to see that same profile in one out of every 9,742 male individuals. In the anal swab, Schepeler again identified a single Y-STR profile that was consistent with appellant's DNA profile, and which had an expected frequency of one out of every 4,264 male individuals.

{¶ 10} On cross-examination, Schepeler was questioned about secondary transfer of DNA, and Schepeler conceded that it was possible for DNA to transfer between garments in a washing machine.

{¶ 11} The final witness to testify was Toledo Police Detective Rebecca Kincaid. Kincaid testified that she conducted the investigation of L.T.'s allegations, which included an interview with L.T. and L.B. Kincaid also obtained the DNA sample from appellant that was used as a standard for the DNA tests.

{¶ 12} Following the presentation of witnesses and the admittance of its exhibits, the state rested. Appellant moved for an acquittal pursuant to Crim.R. 29, which the trial

court denied. Appellant then rested without calling any witnesses or presenting any evidence.

{¶ 13} After the lunch break, and prior to the trial court instructing the jury and the parties presenting their closing arguments, the trial court informed the parties that one of the jurors had reported that she could not hear all of the testimony. The trial court discussed the matter with counsel, and thereafter asked the entire jury generally if they had any particular issue in hearing or seeing any of the testimony given the Covid-19 protocols that were in place. The initial juror, Juror No. 8, and an additional juror, Juror No. 13, indicated that they had difficulty hearing. Juror No. 13 commented that the microphones needed to be turned up but that she "could decipher from viewing what they were saying." The court then had the following exchange:

> THE COURT: You could decipher what they're saying. We had screens on the witness. You didn't have a problem; it was just difficult? Is that fair to say?
>
> JUROR NO. 13: Yes, it was a little difficult.
>
> THE COURT: [Juror No. 8], are you saying it was difficult or you couldn't hear?
>
> JUROR NO. 8: I'm saying it was difficult.

6.

THE COURT:  All right.  Okay.  Thank you.  Anyone else?  Did I miss -- I just saw those two hands.  And no one else is raising his or her hand.

We usually do not do this, but I know that the first witness who testified was difficult to hear at times because she's a young girl and that testimony was not lengthy, but certainly important.  We usually do not give a transcript of trial testimony to the jury.  If it would help because of the five witnesses who testified, I don't want to speak for you, members of the jury, but I believe that the first witness was difficult.  The other witnesses were not so much difficult.  You could see and hear the other witnesses okay?  And both [Juror No. 8] and [Juror No. 13] are nodding their heads in agreement with what I'm saying.

So would it help if I were to provide you with a transcript of the first witness's testimony, the 10 year old?  I wouldn't be able to provide you a transcript of every other witness, but your --

JUROR NO. 13:  No.  The first one would be fine.  Thank you.

THE COURT:  Thank you.  You're indicating to me that the other witnesses you could see and hear okay especially with the screens and the evidence we had up there?

Okay.

Based upon this inquiry, the trial court ordered that the transcript of L.T.'s testimony would be provided to the jury for its deliberations. Appellant was given an opportunity to object to this decision, but expressly declined to do so.

{¶ 14} Ultimately, the jury returned with a verdict finding appellant guilty of the count of rape. The trial court proceeded immediately to sentencing and ordered appellant to serve a minimum term of ten years and a maximum term of life in prison.

## II. Assignments of Error

{¶ 15} Appellant has timely appealed his judgment of conviction, and now asserts two assignments of error for our review:

1. Appellant's conviction for engaging in sexual conduct with L.T. was against the manifest weight of the evidence.

2. The trial court committed error where there is a probability of unfairness and appearance of unjust proceedings when the jury could not adequately hear testimony and could not thoroughly evaluate credibility and veracity in open court.

## III. Analysis

{¶ 16} In his first assignment of error, appellant argues that the jury's finding that he engaged in sexual conduct with L.T. is against the manifest weight of the evidence. When reviewing a manifest weight claim,

8.

[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

*State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 17} In this case, appellant was convicted of rape in violation of R.C. 2907.02(A)(1)(b), which provides, "No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies: * * * (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person." Relevant here, "'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

9.

{¶ 18} Appellant argues that L.T.'s testimony was the only evidence presented in support of his conviction, and that there was no corroborating evidence to support more than the mere *possibility* that appellant engaged in sexual conduct with her.

{¶ 19} Appellant further argues that L.T.'s testimony was not believable for several reasons. First, appellant alleges that L.T. had a clear motive to lie, relying on unsupported assertions that L.T. did not like appellant being a disciplinarian and perhaps used the rape allegation as a way to remove him from her life. Next, appellant argues that L.T.'s story is questionable because it suggests that there was very little time between the rape and when L.B. returned home. Appellant contends that it is nonsensical that he would engage in such an act within minutes of L.B.'s expected arrival. In addition, appellant suggests that L.T.'s immediate disclosure of the rape was contrary to her personality as he knows her, again relying on assertions not supported by the record. Finally, appellant argues that L.T. did not report any pain, which he states would be expected if a grown man penetrated a 10-year-old child.

{¶ 20} As to the evidence demonstrating only a *possibility* that appellant engaged in sexual conduct with L.T., appellant argues that Mells' testimony only revealed a "possible" tear. Additionally, appellant takes issue with Schepeler's testimony because the swabs could not have contained DNA samples from inside L.T.'s vagina because no examination was conducted of the "vaginal vault." Further, appellant suggests that if he had raped L.T., the presence of his DNA would be abundant, and would not have

10.

required the secondary test limited to male DNA. Appellant proposes that the small amount of his DNA that was found could be explained by secondary transfer such as through the laundry.

{¶ 21} Upon our review of the evidence sitting as the thirteenth juror, we find that this is not the exceptional case where the evidence weighs heavily against the conviction. To the contrary, despite appellant's theories about how L.T. fabricated the rape allegation and how his DNA came to be in her private area, the evidence at trial fully supports the jury's finding of guilt. L.T. testified at trial that appellant "put his thing insider [her]." L.T. made similar reports to her mother, and to Mells. Mells' examination of L.T. revealed not only a possible two-inch tear of the hymen, but also a laceration of the posterior forchette, as well as redness on L.T.'s perineum. Finally, the swabs conducted on the outside *and inside* of L.T.'s vagina contained a *single* Y-STR profile, which was found to be consistent with appellant's profile. Based upon the foregoing, we hold that the jury did not clearly lose its way or commit a manifest miscarriage of justice when it found that appellant engaged in sexual conduct with L.T.

{¶ 22} Accordingly, appellant's first assignment of error is not well-taken.

{¶ 23} In his second assignment of error, appellant argues that his due process rights were violated because at least two jurors could not adequately hear the testimony of the witnesses.

11.

{¶ 24} "A fair trial in a fair tribunal is a basic requirement of due process. * * * [O]ur system of law has always endeavored to prevent even the probability of unfairness." *State v. Clinkscale*, 122 Ohio St.3d 351, 2009-Ohio-2746, 911 N.E.2d 862, ¶ 15, quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.E.2d 942 (1955).

{¶ 25} In this case, appellant argues that he was denied due process because two jurors could not hear the testimony of L.T. Appellant further argues that the trial court's remedy of providing the transcript of L.T.'s testimony was ineffective because it could not provide the inflections, facial expressions, body language, reactions, or any other cues which would allow the juror to determine the witness's credibility. We disagree.

{¶ 26} In support of his assignment of error, appellant cites *State v. Turner*, 186 Wis.2d 277, 521 N.W.2d 148 (Wis.App.1994). In *Turner*, the defendant argued that his due process rights were violated because the jurors were unable to hear the testimony of two witnesses who accused him of sexual assault. In that case, the record was replete with references to the jurors being unable to hear the testimony. Because of this, the trial court conducted a voir dire of all of the jurors. Most of the jurors stated that they had heard the testimony. "One, when asked whether he had heard the testimony, replied: 'Not the best, no.' The court asked: 'In other words, you were able to understand?' The juror responded: 'Some of it, yes.... I wish I could understand better.' A second juror testified: 'I have had problems.... I heard some, not all.'" *Id.* at 282. Nonetheless, the

12.

trial court denied the defendant's motion for a mistrial. On appeal, the Wisconsin Court of Appeals reversed. The court reasoned:

> [O]nce it is determined that a juror missed material testimony which bears on a defendant's guilt or innocence, prejudice must be assumed "for the sake of insured fairness." * * * In this case, the trial court found that two of the jurors did not hear the testimony. We accept that finding because it is not clearly erroneous.
>
> The credibility of a witness is determined by more than a witness's words. Tonal quality, volume, and speech patterns all give clues to whether a witness is telling the truth. * * * Thus, it was critical for each juror to hear the testimony from each witness and relate that testimony to the witness's demeanor. We therefore reject the State's contention that putting all the witnesses together resulted in the jury getting enough evidence to fairly judge Turner. There is little question that at least one juror did not hear the testimony of all witnesses. We conclude that Turner's federal and state constitutional rights to an impartial jury and due process were infringed when either one or two jurors were unable to hear the testimony of material witnesses.

*Id.* at 284-285.

13.

{¶ 27} Here in contrast, as pointed out by the state, the two jurors who indicated a problem did not state that they could not hear the testimony of L.T., only that it was difficult. In particular, Juror No. 8 expressly distinguished that it was difficult to hear, not that she could not hear. Similarly, Juror No. 13 indicated that she could decipher what L.T. was saying, but "it was a little difficult." Thus, unlike *Turner*, this is not a situation where the jurors were unable to receive all of the testimony, and in fact, the trial court ensured that they received the testimony by providing them with the transcript. Moreover, the transcript provided to the jurors was not a "cold transcript." Instead, the jurors had the opportunity to view the witness as she was testifying, and to examine her facial expressions, body language, vocal inflections, and any other cues bearing on her credibility. Finally, we note that despite being given the opportunity to do so, appellant expressly did not object to the trial court's remedy of providing the transcript to the jury. Under these circumstances, we find that appellant was afforded a fair trial in a fair tribunal, and there was not even the appearance of unfairness. Therefore, we hold that appellant's due process rights were not violated.

{¶ 28} Accordingly, appellant's second assignment of error is not well-taken.

## IV. Conclusion

{¶ 29} For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Thomas J. Osowik, J.

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.